ROBERT A. MEISTER AND WENDY MEISTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meister v. Commissioner
Docket No. 34626-86.
United States Tax Court
T.C. Memo 1988-487; 1988 Tax Ct. Memo LEXIS 514; 56 T.C.M. (CCH) 440; T.C.M. (RIA) 88487; October 6, 1988. David A. Schmudde, for the petitioners. Frank Agostino and Carroll D. Lansdell, for the respondent COHEN
MEMORANDUM OPINION COHEN, Judge: Respondent determined a deficiency of $ 86,987 in petitioners' 1982 Federal income tax. As stipulated by the parties, the issues for decision are (1) whether the partnership February Associates acquired a depreciable interest with respect to its investment in the motion picture "I Ought To Be in Pictures"; if the partnership did acquire a depreciable interest, (2) what was its depreciable basis, and was such basis subject to discounting pursuant to section 483; [1] (3) whether petitioners, as limited partners, are entitled to claim an investment tax credit arising out of their interest in the partnership, and if so, in what amount; (4) whether the partnership's failure to include the statement described *516 by section 1.48-8(g)(1), Income Tax Regs., on its 1982 partnership return precludes petitioners from claiming any investment tax credit with respect to the picture; (5) whether petitioners are liable for additional interest under section 6621(c); (6) whether petitioners are liable for an addition to tax under section 6659; and (7) whether petitioners are liable for an addition to tax under section 6661. With respect to certain other issues, the parties have agreed to be bound by the final determination in Madden v. Commissioner, Docket Nos. 5790-86 and 19679-85. All of the facts have been stipulated, and the stipulated facts are incorporated as our findings by this reference. Petitioners resided in New York, New York, when the petition was filed. The Partnership
During March 1982, Robert A. Meister (petitioner) became a limited partner in February Associates, A New York limited partnership. The stated purpose of the partnership was to acquire rights in the motion picture "I Ought To Be In Pictures" *517 (or the picture) from the Twentieth Century-Fox Film corporation (Fox) and to exploit the rights by engaging Fox as the distributor of the picture. The general partners of February Associates were Ira N. Smith (Smith) and Stephen R. Greenwald (Greenwald). "I Ought To Be in Pictures" starred Walter Matthau, Ann Margaret and Dina Mannoff, and was a comedy about an aspiring actress who goes to California and locates her real father, whom she had not seen since early childhood. The picture was produced under contract with Fox by Herbert Ross and Neil Simon. Prior to the release of the picture, Fox entered into exhibitor and television licensing agreements. Fox also prepared pre-release estimates of revenue and expenses. These estimates of revenue were based on test marketing, including but not limited to "sneak previews." Based on the test marketing, Fox determined that it would be necessary to expend substantial amounts on marketing prior to release of the picture in order successfully to exploit the picture. No appraisals or prerelease estimates of revenue were done by or on behalf of the partnership or the general partners with respect to the picture. The Private Placement *518 Memorandum for February Associates (the Memorandum) estimated that the gross proceeds from the sale of partnership units would be $ 3,355,000. Of the total estimated gross proceeds, $ 350,000 (more than 10 percent) was to be paid either to the general partners (a $ 100,000 Management Fee) or to Smith's affiliate, R. A. Inbows, Ltd. (a $ 250,000 Marketing Consulting Fee). Only $ 400,000 (almost 12 percent of the anticipated proceeds was to be used to make a cash payment for the picture. The Memorandum specified that the Distribution Agreement between February Associates and Fox would give Fox the exclusive right to exploit the picture in all media for an initial period of 15 years with the right, exercisable by Fox, to extend the term for additional periods of up to 110 years. In regard to the profitability of the investment, the Memorandum indicated: Only a small percentage of motion pictures generate a profit (after recoupment of the cost of the picture) to the owners of such pictures. There can be no assurance, therefore, that the Picture will yield sufficient revenues from its distribution and other exploitation to return to investors all or a portion of their capital contribution *519 or provide investors with a profit. This may be so even if Fox, by reason of its distribution fees, derives a profit from the exploitation of the Picture. In order for the Partnership to receive from Fox an aggregate amount equal to the capital contributions of the Limited Partners, the Picture would have to earn $ 38,000,000 of Gross Receipts or $ 4,200,000 of Television Proceeds. These levels of Gross Receipts are substantially in excess of the average for all motion pictures. Any prospective investor should be prepared for the loss of his investment. * * * On March 25, 1982, February Associates and Fox entered into agreements regarding the rights to and exploitation of the picture and consisting of: (1) a Purchase and Sale Agreement and various related instruments, including a Copyright Assignment, a Supplemental Agreement to Copyright Assignment (the Supplemental Assignment), and an Assumption Agreement, (the sale documents) and (2) a Distribution Agreement. The Sales Documents
According to the Purchase and Sale Agreement, Fox (Seller) agreed to sell, assign, transfer, and deliver to February Associates (Purchaser) generally: all of Seller's right, title and interest *520 in and to the Picture, the copyright pertaining thereto (and all renewals and extensions thereof) throughout the world, all negative film and preprint materials relating to the Picture delivered to Purchaser pursuant to Paragraph 2. (c) hereof and such rights int he literary work on which the Picture is based as may be necessary to permit the distribution, exhibition and exploitation of the Picture in all media, and the right to cause the Picture to be distributed, exhibited, and exploited in all media throughout the world. * * *
Fox specifically reserved under the Purchase and Sale Agreement and the Copyright Assignment certain rights in the picture and the literary work on which the picture is based, including: (i) Remake Rights: * * * (ii) Sequel Motion Picture Rights: * * * (iii) Legitimate Stage Rights: * * * (iv) Music Publishing Rights: * * * (v) Soundtrack Recording Rights: * * * (vi) Merchandising Rights: * * * (vii) Literary Publishing Rights: * * * (viii) Radio Rights: * * * (ix) Live Television Rights: * * * (x) Literary Materials Rights: * * * (xi) Copyright: To secure copyright with respect to any *521 and all of the products resulting from the exercise of any and all rights reserved to Seller in Seller's own name anywhere in the world and to secure any renewals and extensions thereof wherever and whenever permitted. (xii) Other Items: Any and all other negative and preprint materials relating to the Picture other than those delivered to Purchaser pursuant to Paragraph 2. (c) hereof as well as such other copies of the Picture that Seller may own. * * * Under the purchase and Sale Agreement, the partnership agreed to pay a purchase price of $ 15,000,000 for the picture, as follows: Amount
Form of Payment
Date Payable
$    400,000
Cash
March 25, 1982
8,600,000
Recourse Promissory Note
March 15, 1994
3,318,000
Nonrecourse Promissory Note
March 15, 1994
2,682,000
Promissory Note
March 15, 1994
The interest component of the notes was nonrecourse to the limited partners and to the partnership. The Promissory Note was to be converted into a "full recourse" promissory note in the event that 14 days following the initial release of the picture by Fox under the Distribution Agreement, the picture was being exhibited in at least 600 United States *522 theatres. (This provision was later modified by an amendment described below.) The partnership granted Fox a security interest in the picture, including the partnership's rights in and title to physical properties, underlying properties, copyrights, contract rights, and proceeds and products, as collateral security for the full payment of the principal and interest on the Purchase Notes. The Purchase and Sale Agreement also provided that: if and to the extent any principal or interest remains unpaid on the Recourse Promissory Note on the maturity date thereof or on the Promissory Note (in the event that the Promissory Note is converted to a full recourse promissory note * * *) on the maturity date thereof, then Seller shall have full recourse thereof against the Purchaser, and all the Limited Partners thereof who shall be required to execute the Assumption Agreements * * * it being understood and agreed that such recourse against each such Limited Partner shall be limited to the "Maximum Liability" set forth in the Assumption Agreements signed by such Limited partner and that the liability of the Purchaser and the Limited Partners under such Assumption Agreements shall be several *523 and not joint and shall, in all respects, be subject to the terms and conditions of said Assumption Agreements. * * *
The Assumption Agreement set petitioner's maximum dollar liability at 2.5 percent of the principal of the Recourse Purchase Note, or $ 215,000. The Purchase and Sale Agreement further provided in relevant part: 5. SELLER'S OBLIGATIONS: Seller shall remain obligated with respect to all considerations provided to be paid, including participations in the receipts of the Picture, pursuant to all contracts covering services of artists, personnel and studio facilities, and purchases, licenses and all other obligations and undertakings connected with the production of the Picture, including all payments required (including employer fringe benefits and taxes payable with respect thereto) under applicable collective bargaining agreements by reason of or as a condition to any exhibition of the Picture, or any part thereof, or any use or reuse thereof for any purpose or in any media whatsoever. 6. INVESTMENT TAX CREDIT: For purposes of Section 48 of the Internal Revenue Code, Purchaser will have the right to claim an investment tax *524 credit with respect to the Negative Cost of the Picture being sold, assigned, transferred and delivered to Purchaser hereunder only upon an ownership interest for such purpose not in excess of $ 9,000,000.00. * * * 8. COVENANTS OF PURCHASER: Purchaser hereby covenants and agrees with Seller as follows: * * * (f) Distribution Agreement: Concurrently herewith, Purchaser will enter into a distribution agreement with Seller ("Distribution Agreement") containing such terms and conditions, consistent with the customs of the motion picture industry and Seller's customary distribution policies, as Seller may approve, pursuant to which Seller will be granted the sole and exclusive worldwide right to distribute, exhibit and exploit the Picture in all media for a term of fifteen years with options on the part of Seller to extend the term thereof if certain criteria are met. 11. GENERAL:
* * * (e) Binding Effects; Benefits: This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns, but neither this Agreement nor any rights or obligations hereunder may be assigned, pledged or encumbered *525 by Purchaser except as expressly provided in paragraph 8. (b) hereof. Nothing herein is intended to confer on any person other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement.
The delivery requirements of the Purchase and Sale Agreement required Fox, at Fox's expense, to make physical delivery of the action and sound track negatives, completed trailer material, and their film items to the printers of the picture. Under the Supplemental Assignment, the partnership irrevocably appointed Fox as its sole and exclusive attorney-in-fact to secure, register, renew, and extend all copyrights in the picture and all related properties. The Supplemental Assignment prohibited the partnership from changing the notice of copyright on the picture. It empowered Fox to bring, prosecute, defend, and appear in all matters of any nature concerning the copyright in its own name or in the name of the partnership at Fox's expense. Fox would retain any recovery arising from any violation of the copyright. Fox would not be liable, responsible, or accountable to the partnership for any action *526 or failure to act on behalf of the partnership with respect to the copyright unless such act or failure to act was performed or omitted fraudulently or in bad faith or constituted wanton and willful misconduct or gross negligence. The Distribution Agreement
Fox would not have entered into the Purchase and Sale Agreement with the partnership unless the partnership agreed to enter simultaneously into the Distribution Agreement with Fox. Under the Distribution Agreement, February Associates conveyed to Fox: the sole, exclusive right, license and privilege, throughout the world, to distribute, exhibit, advertise, publicize, transmit, project, perform, reissue, subdistribute, sublicense, lease, rent, exploit and generally deal in and with the Picture, trailers thereof, and excerpts and clips therefrom, and all rights therein of every kind and nature, and in any and all languages (including dubbed, titled, and narrated versions) in all sizes and gauges of film and other forms of Motion Picture Copies and for any and all purposes and uses, and by every means, method, process, medium or device now or hereinafter known, invented, contemplated, developed, or devised, and to sublicense *527 others so to do, * * * Without limiting the generality of the foregoing, the rights granted to Fox shall include the sole and exclusive right: (a) Titles: To use the title or titles by which the Picture is or may be known or identified and to change the title of the Picture. (b) Terms and Exploitation: To permit, authorize and license others to exercise and to sublicense all or any of Fox's rights and licenses hereunder, and to distribute, exhibit, advertise, publicize and exploit the Picture under any term or terms and in such manner as Fox in its sole business judgment may determine proper or expedient. Anything elsewhere in this Agreement to the contrary notwithstanding (except as set forth in Paragraph 2.(a) of Schedule "A attached hereto), Owner shall have no control whatsoever in or over the manner or extent to which Fox or any licensee of Fox shall exploit the Picture, nor with reference to the terms and provisions of any licenses granted by Fox to third parties, nor as to the sufficiency or insufficiency of proceeds from the Picture. (c) Changes: To make such changes, alterations, cuts, additions, deletions, interpolations and eliminations into and from the *528 Picture as Fox may deem necessary or advisable for the effective marketing, distribution, exploitation, or other use of the Picture. (d) Versions: To make such dubbed and sub-titled versions of the Picture and trailers thereof, including without limitation, synchronized and superimposed versions in any and all languages for use in such parts of the Territory as Fox and its licensees may deem advisable. (e) Fox's Name and Trademark: To use Fox's name and trademark on the positive prints of the Picture and in trailers thereof, and in all advertising and publicity relating thereto, in such a manner, position, form and substance as Fox may elect. (f) Publicity and Advertising: To publicize and advertise the Picture throughout the Territory during the Distribution Term and to cause or permit others so to do, * * * (g) Trailers: To cause trailers of the Picture to be manufactured, exhibited, and distributed by every means, medium, process, method and device now or hereafter known.
The "delivery requirements" of the Distribution Agreement were the same as those of the Purchase and Sale Agreement. The initial term of the Distribution Agreement was 15 years. *529 Fox was given the option to extend the term of the distribution Agreement up to 110 years, depending on Fox's success in exploiting the picture. Schedule A of the Distribution Agreement set forth the following payment terms. 1. OWNER'S PARTICIPATION:
(a) Gross Proceeds of Net Proceeds participation: In order to induce Owner to enter into the Main Agreement and as consideration for the rights granted and agreed to be granted by Owner to Fox, Fox agrees to pay to Owner the greater of (i) or (ii) below: (i) An amount equal to the following percentages of the Gross Proceeds of the Pictures in the aggregate, as such amount shall be computed, determined and paid in accordance with Exhibit "1" attached hereto. (A) Twenty percent (20%) of the first $ 5,000,000.00 of Gross Proceeds; (B) Then, zero percent (0%) of the next $ 5,000,000.00 of Gross Proceeds; (C) Then, eleven and one-half percent (11-1/2%) of the next $ 28,000,000.00 of Gross Proceeds; (D) Thereafter, five percent (5%) of all Gross Proceeds in excess of $ 38,000,000.00. (ii) An amount equal to one hundred percent (100%) of the Net Proceeds of the Pictures in the aggregate, as such amount shall be *530 computed, determined and paid in accordance with Exhibit "1" attached hereto. * * * (b) Additional Proceeds Participation: If the Owner earns less than $ 4,200,000.00 pursuant to Paragraph 1.(a) above through the Statement Period ending December 31, 1990, the Owner shall be entitled to receive as additional consideration for the rights granted and agreed to be granted by Owner to Fox, the lesser of (i) or (ii) below: (i) An amount equal to one hundred percent (100%) of the Television Gross Proceeds as of December 31, 1990, less any Television Gross Proceeds included with the aggregate amounts paid or payable pursuant to Paragraph 1.(a) above as of December 31, 1990. Television Gross Proceeds shall mean the amount remaining, if any, after first deducting from Free Television Rentals and Supplemental Television Rentals the aggregate of the Off-The-Top Deductions arising by reason of, in connection with or relative to the derivation of Free Television Rentals and Supplemental Television Rentals, all as defined in Exhibit "1" attached hereto. (ii) An amount equal to the difference between $ 4,200,000.00 and the aggregate amounts paid or payable pursuant to Paragraph 1.(a) *531 above as of December 31, 1990.
(This provision was later deleted by an Amendment described below.) The Distribution Agreement defined Net Proceeds generally as total gross receipts less Distribution Fees, Participations, Purchase Notes (Recourse and Nonrecourse), interest on Purchase Notes, and various identified production and operation costs. Fox's Distribution Fee was calculated as follows: 1. Thirty-five percent (35%) for the first $ 10,000,000.00 of Gross Receipts; and 2. Forty percent (40%) of the next $ 2,500,000.00 of Gross Receipts; and 3. Fifty-five percent (55%) of Gross Receipts in excess of $ 12,500,000.00 of Gross Receipts.
Participations for purposes of computing Net Proceeds were defined as follows: 1. Neil Simon
10% of Adjusted Gross
Receipts in excess of the
first $ 10,000,000 of Adjusted
Gross Receipts.
2. Hera Productions,
10% of Adjusted Gross
Inc.
Receipts in excess of a
Herbert Ross
sum equal to the aggregate
of: (i) 3 times the Direct
Charges of the Picture;
(ii) Fox Administrative
Overhead Charge; (iii)
Interest on Negative Cost
and (iv) Agreed Overbudget
Deduction.
3. Walter Matthau
10% of Gross Proceeds of the
Picture in excess of
$ 20,000,000 of Gross Proceeds;
plus an additional 5% of Gross
Proceeds in excess of
$ 30,000,000 of Gross Proceeds.
*532 With respect to "Owners' Participation," Schedule A of the Distribution Agreement further provided: (c) Remaining Gross Proceeds: In addition, after the deduction of the percentages of Gross Proceeds set forth in Paragraph 1.(a)(i) above and the Additional Proceeds Participation set forth in Paragraph 1.(b) above, if any, the balance of Gross Proceeds ("Remaining Gross Proceeds") up to $ 15,000,000.00 of such remaining Gross Proceeds shall be payable to Owner and disbursed as herein provided. Thereafter, there shall be no further computations or payments made hereunder to Owner with respect to Remaining Gross Proceeds earned by Owner, if any, will be deferred and paid in four annual installments commencing January 31, 1991 with interest at the rate of sixteen percent (16%) per annum on the amounts earned hereunder from the date the Distribution Statement is rendered reporting the amount of Remaining Gross Proceeds payable to Owner until payment thereof. Such interest shall be paid in four installments, at the same time as the amounts of Remaining Gross Proceeds are paid. The first installment of interest shall equal thirty-five percent (35%) of the interest then *533 payable; the second installment of interest shall equal forty-five percent (45%) of the interest then payable; the third installment of interest shall equal sixty-three percent (63%) of the interest then payable; the fourth installment shall equal the balance of the interest then payable. Remaining Gross Proceeds plus interest thereon shall hereinafter be referred to as the "Aggregate Deferred Amount." [Emphasis is supplied.] Notwithstanding the foregoing provisions of this subparagraph (c), in the event that the aggregate of all sums payable to Owner pursuant to Paragraphs 1.(a) and 1.(b) above equal an amount less than $ 4,200,000.00, Owner shall be entitled, at it's election, to receive from Fox the difference between $ 4,200,000.00 and the aggregate of all sums payable to Owner pursuant to Paragraphs 1.(a) and 1.(b) above out of the Aggregate Deferred Amount in excess of the first $ 4,000,000.00 of Remaining Gross Proceeds plus interest thereon computed pursuant to this subparagraph (c). Owner shall exercise its election referred to in the foregoing sentence, by notifying Fox by registered mail, return receipt requested, no later than January 15, 1991. Notwithstanding any *534 other provision of the Main Agreement and the Purchase and Sale Agreement and any schedules or exhibits attached to each such Agreement, the portion of the Aggregate Deferred Amount with respect to which owner has exercised its election as aforesaid shall be treated for all purposes, including manner of payment, as amounts payable under Paragraph 1.(a) hereof and not under this subparagraph (c).
(This provision was deleted by and Amendment described below.) * * * (e) Application and Priority of Remaining Gross Proceeds: Owner has agreed that the Remaining Gross Proceeds from the Picture shall be used to reduce Owner's indebtedness to Fox with respect to the Purchase and Sale Agreement referred to in Paragraph 3.(h) of the Main Agreement in the following priority: (i) The Remaining Gross Proceeds shall first be applied to the principal balance of the Recourse Promissory Note until paid; then thereafter (ii) The Remaining Gross Proceeds shall be applied to the principal balance of the Promissory Note until paid; then thereafter (iii) The Remaining Gross Proceeds shall be applied to the principal balance of the Non-Recourse Promissory Note, the Promissory Note and the *535 Non-Recourse Promissory Note on a pro rate basis until paid. The parties have agreed that the licensing agreements that Fox entered into with exhibitors prior to the release of the picture would have provided the partnership, through the Distribution Agreement, with sufficient funds to satisfy the principal but not interest of the Recourse Purchase Note, provided all amounts were paid when due. The parties have also agreed that Fox's pre-release television licensing agreements would have provided the partnership through the Distribution Agreement with a return of its cash investment in the picture, provided all amounts were paid when due. Fox released the picture on or about March 26, 1982. In May 1982 Fox's post-release estimates of revenue and expenses indicated that the picture would have gross receipts from all sources of $ 13,000,000 and direct costs of $ 20,621,000, broken down as follows: Direct Negative Cost
$  8,502,000
Participations
1,490,000
Distribution Expenses-theatrical
9,189,000
Distribution Expenses-television
1,440,000
$ 20,621,000
On November 29, 1982, following discussions between Fox and February Associates, George Funk (Funk) *536 of Fox mailed to Steve Chao (Chao), in care of Greenwald, a proposed Amendment to the Purchase and Sale and Distribution Agreements. The proposal stated in relevant part: For good and valuable consideration, particularly the execution by Fox of the Purchase and Sale Agreement, and the Distribution Agreement, receipt of which is hereby acknowledged, Fox and February hereby agree that the Sale Documents and the Distribution Documents shall be amended as follows: 1. Notwithstanding the number of theaters in which the Picture is being exhibited on the date occurring fourteen days following the initial release of the Picture, the Promissory Note shall hereby be deemed converted into a full recourse promissory note. 2. Paragraph 1.(b) of Schedule "A" of the Distribution Agreement shall be deleted and all references throughout the Sale Documents and Distribution Documents to Paragraph 1.(b) of Schedule "A" of the Distribution Agreement shall be deleted. 3. Paragraph 1.(c) of Schedule "A of the Distribution Agreement shall be deleted and inserted in lieu thereof shall be the following: (c) Remaining Gross Proceeds:
(i) In addition, after the deduction of the percentages *537 of Gross Proceeds set forth in Paragraph 1.(a)(i) above, the balance of Gross Proceeds ("Remaining Gross Proceeds") up to $ thereof shall be payable to Owner and disbursed as herein provided. Thereafter there shall be no further computations or payments made hereunder to Owner with respect to Remaining Gross Proceeds and all such Remaining Gross Proceeds shall be retained by Fox. The amounts of Remaining Gross Proceeds earned by Owner, if any, will be deferred and paid in four annual installments commencing January 31, 1991 with interest at the rate of sixteen percent (16%) per annum on the amounts earned hereunder from the date the Distribution Statement is rendered reporting the amount of Remaining Gross Proceeds payable to Owner, until payment thereof; provided, however, that for Remaining Gross Proceeds reported on Distribution Statements rendered before January 31, 1984, interest shall commence accruing on January 31, 1984. Such interest shall be paid in four installments, at the same time as the amounts of Remaining Gross Proceeds, are paid. The first installment of interest shall equal thirty-five (35%) of the interest then payable; the second installment of interest *538 shall equal forty-five percent (45%) of the interest then payable; the third installment of interest shall equal sixty-three percent (63%) of the interest then payable; the fourth installment shall equal the balance of the interest then payable. Remaining Gross Proceeds plus interest thereon shall hereinafter be referred to as the "Aggregate Deferred Amount". [Emphasis supplied.] (ii) Notwithstanding the foregoing provisions of subparagraph (c)(ii), [sic] in the event that the aggregate of all sums payable to Owner through the statement period ending December 31, 1990 pursuant to Paragraph 1.(a) above equals an amount less than $    ("Shortfall Amount") Owner shall receive from Fox the Shortfall Amount out of the Aggregate Deferred Amount. Notwithstanding any other provision of the Main Agreement and the Purchase and Sale Agreement and any schedules or exhibits attached to each such Agreement, the portion of the Aggregate Deferred Amount payable to Owner in accordance with this subparagraph (c)(ii) shall be treated for all purposes, including manner of payment, as amounts payable under Paragraph 1.(a) hereof and payable pursuant to section VII.D.1.(c)(1) of Exhibit 1 *539 to this Schedule A and not under this subparagraph (c). (iii) Notwithstanding the foregoing, to the extent, if any, that the Shortfall Amount shall be less than $    , the Aggregate Deferred Amount shall automatically be deemed reduced, for all purposes, by an amount equal to the extent by which the Shortfall Amount is less than $    . * * * 6… The parties hereto agree to execute and deliver such further instruments and documents as Fox shall reasonably request to effectuate the purposes and intents as set forth in this letter.
Funk requested Chao to "make the necessary computations and propose the figures to be included in each of the blanks" of the Amendment. By letter dated December 10, 1982, Chao submitted to Fox the requested calculations pertaining to the proposed Amendment. Chao determined the partnership's total payments under the purchase notes as follows: Total Interest Expense
$ 22,876,500
Principal of Debt
14,600,000
Shortfall Cash
2,183,192
$ 39,659,692
Chao determined Fox's total interest income as $ 22,882,000 and Remaining Gross Proceeds as $ 16,825,00 pursuant to the agreements with the partnership. Chao computed the *540 "shortfall" as: $ 4,200,000
Minimum Cashback
2,016,808
Cashback earned at $ 16,825,000
of all Remaining Gross
2,183,192
Shortfall
The Amendment was executed by the partnership and Fox sometime after December 10, 1982, and dated "as of March 26, 1982." Tax Treatment
On or about March 19, 1983, February Associates filed its Form 1065, 1982 U.S. Partnership Return of Income, and a Depreciation and Amortization Schedule, Form 4562. Therein, the partnership reported a depreciable basis in the picture of $ 15,000,000 and amortizable organization costs of $ 10,000. The partnership reported no income for 1982. The partnership claimed the following deductions: Accelerated Cost Recovery
$  2,250,000       Other Deductions
Consulting Fee
$    249,545
Marketing Fee
2,600,000
Tax Advice
27,476
Other Expenses
328
Amortization
(organization costs)
2,000
2,879,349       Total Deductions
$  5,149,349  [sic]
Ordinary Income (Loss)
$ (5,149,349) [sic]
The partnership reported petitioner's share of the ordinary loss to be $ 128,734. The return did not include *541 the statement of production costs described in section 1.48(g)(1), Income Tax Regs.
On their 1982 joint individual income tax return, petitioners claimed a $ 128,734 distributive share of the partnership loss. On Form 3468, Computation of Investment Tax Credit, petitioners reported an unadjusted basis in the picture of $ 225,185 and claimed an investment tax credit of $ 22,519. Respondent disallowed all of petitioners' losses attributable to the February Associates activity and the investment tax credit with respect to the picture. The Partnership's Interest in the Picture
Respondent, relying principally on Bailey v. Commissioner,90 T.C. 558 (1988), argues that the partnership did not own the picture for tax purposes; rather, the partnership merely "purchased" the right to a return of its capital investment, which in economic substance is a loan. Petitioners, on the other hand, essentially argue that the transactions between Fox ;and February Associates were motivated by business purposes, shifted the benefits and burdens of ownership of the picture to the partnership, and were supported by economic substance. Whether the partnership *542 owned the picture for tax purposes is to be determined by reference to the written agreements read in light of the attending facts and circumstances. Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986). For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. Bailey v. Commissioner,90 T.C. at 607; Taube v. Commissioner,88 T.C. 464, 475 (1987). No sale occurs if the transferor retains substantial proprietary rights in the motion picture. Durkin v. Commissioner,87 T.C. 1329, 1369 (1986), on appeal (7th Cir., Feb. 1988); see Carnegie Productions, Inc. v. Commissioner,59 T.C. 642, 653 (1973); Cory v. Commissioner,23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). The existence of language within the Purchase and Sale Agreement purporting to convey ownership of the picture to the partnership is not determinative of whether the partnership actually became the owner for tax purposes. *543 We conclude that February Associates did not acquire a depreciable interest in "I Ought To Be In Pictures," but in substance purchased an intangible contractual right to payments contingent upon the success of Fox's exploitation of the picture. See Bailey v. Commissioner, supra;Durkin v. Commissioner, supra;Tolwinsky v. Commissioner, supra;Law v. Commissioner,86 T.C. 1065 (1986), on appeal (9th Cir., Dec. 29, 1986). An examination of the written agreements and surrounding circumstances reveals that the partnership acquired no substantial ownership rights in the picture. In this regard, this case is a virtual remake, so to speak, of Bailey v. Commissioner, supra;Durking v. Commissioner, supra; and Tolwinsky v. Commissioner, supra. Fox ostensibly transferred the copyright and negative to the partnership, while reserving sequel, remake and other derivative rights and receiving a security interest in the copyright and negative. Concurrently, the partnership granted back to Fox its basic rights associated with the copyright, including the rights to make copies of the *544 picture, to distribute copies of the picture to the public, and otherwise to exploit the picture in any manner throughout the world. The delivery requirements of the sale and distribution agreements with respect to the negative were identical. Fox would not have entered into the purchase agreement unless the partnership simultaneously entered into the Distribution Agreement with Fox. The substantive effect of the agreements was that Fox retained possession of the negative and the entire bundle of rights comprising the copyright. The term of the Distribution Agreement was 15 years; however, the grant of the rights therein was, in an economic sense, indefinite. While a motion picture may generate gross receipts indefinitely, petitioners and respondent agree that, as a general rule, the useful economic life of a motion picture is 3 to 5 years. Depending on its success in exploiting the picture, Fox could extend the term of the Distribution Agreement for 110 years, far exceeding the projected useful economic life of the picture. Fox retained significant other rights and liabilities commonly associated with ownership. See Bailey v. Commissioner,90 T.C. at 609; *545 Durkin v. Commissioner,87 T.C. at 1370. Fox retained a significant financial interest in, and virtually absolute control over, the exploitation of the picture. Fox had the right to use its name with respect to the picture's copyright notice. Fox was irrevocably empowered as exclusive attorney-in-fact to secure, register, renew, and extend all copyrights in the picture and to defend the copyright at Fox's expense. Fox would retain any recovery arising from a copyright violation. Fox remained liable on all obligations arising from the production of the picture. Petitioners argue that "probably the most telling single fact with respect to ownership of this movie is that if a third party wished to purchase ultimate rights to the film, that party would look to the partnership, not Fox." This "fact" tells us nothing. Any sale by the partnership of its interest in the picture would have been subject to the terms of the Distribution Agreement and certain provisions within the purchase documents. A prospective purchaser might have to enter into an agreement with the partnership but would look at Fox's role to determine what it was acquiring and what value it had. *546 Respondent's argument that the partnership's advance of funds to Fox actually constituted a loan is based on his assertions that the "Picture would have had to gross in excess of $ 100,000,000 to generate any Net Proceeds and over $ 250,000,000 to achieve breakeven under the general terms of the Distribution Agreement," that "No picture has ever grossed $ 250,000,000," that "Post-release estimates * * * indicate that the Picture would only gross $ 12,000,000," and that "the Partnership 'purchased' the right to a return of its capital investment and little else." Given the terms of the Distribution Agreement, the partnership's investment was clearly speculative. The quality of the picture and the prior success of those involved in it imply a potential for financial success. The post-release estimates indicate nothing about the marketing potential of the picture as of the date the partnership entered into the agreements with Fox. The stipulated facts do not, therefore, support a finding that the partnership anticipated no more than a return of capital. Because we have determined that Fox was the actual owner of the picture for Federal tax purposes, the partnershp has not depreciable *547 interest in, and thus is not entitled to claim depreciation on, the picture. Law v. Commissioner,86 T.C. at 1097. The partnership merely acquired an intangible contractual right to payments contingent upon the success of Fox's exploitation of the picture. The partnership is entitled to depreciate this right. In Durkin v. Commissioner, supra, we discussed in detail the alternative rationales for depreciating this type of right. See Bailey v. Commissioner,90 T.C. at 614, and the cases cited therein. Amount of Depreciation
The next issue for -determination is what amount, if any, can the partnership include in depreciable basis in the above-mentioned intangible contract right. Petitioners concede that the partnership cannot include any part of the Nonrecourse Purchase Note to Fox in depreciable basis. The partnership also may not include any part of the Recourse Purchase Note or the Promissory Note in depreciable basis because its liability under them was illusory.
When a transaction is structured so that payment of a putative *548 debt by the taxpayer is not probable, either becauise of the length or the terms of the debt, the source of the payments, or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, the debtor is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. Durkin v. Commissioner,87 T.C. at 1376; see also Tolwinsky v. Commissioner,86 T.C. at 1048-1050. Such a debt does not reflect an actual investment in property and cannot be included in the taxpayers depreciable basis. Durkin v. Commissioner,87 T.C. at 1377, and the cases cited therein. Prior to the release of the picture, Fox entered into licensing agreements with exhibitors which would have provided the partnership with sufficient funds to satisfy the principal but not interest on the Recourse Purchase Note and would have provided the partnership with a return of its cash investment in the picture. Pursuant to the Distribution Agreement, the partnership had no right to the Remaining Gross Proceeds, except to the extent that they were used to satisfy the purported debt or return *549 the partnership's cash down payment. These provisions would not apply unless gross receipts were insufficient under the general terms of the Distribution Agreement to cancel the purported recourse debt. Moreover, the exchanges between the parties leading to the Amendment to Purchase and Sale and Distribution Agreements demonstrate the parties' intent that the partnership was never to assume any deficit liability on the purchase notes. Under its original terms, the Promissory Note was to be converted into a full recourse note in the event the picture was exhibited in at least 600 theatres within 14 days of release. The stipulated facts do not include the number of theatres in which the picture was playing 14 days after release. Subsequent to December 10, 1982, Fox and the partnership modified the 14-day condition and purported to convert the Promissory Note from nonrecourse to recourse "as of March 25, 1982." Petitioners have not demonstrated that the amendment should be retroactively operative with respect to tax consequences. See Van Den Wymelenberg v. United States,397 F.2d 443 (7th Cir. 1968). If anything, the amendment reflected the illusory nature of *550 the notes. The absence of real liability on the partnership's notes, as well as the minimal risk the partnership assumed under the entire arrangement, is aptly described in petitioners' brief. With respect to why the partnership accepted the structure of the deal, petitioners acknowledge "Past experience shows that such films could do well or could do very poorly. The investors wished to share in any huge success but protect against a real failure. Therefore, the film was distributed with much of the costs guaranteed." The illusory notes must be disregarded. The partnership's depreciable basis in the income interest intangible asset is thus limited to the cash down payment of $ 400,000. We need not, therefore, discuss respondent's section 483 discounting argument. The parties have stipulated that the partnership may use either the income-forecast or straight-line method of depreciation. Using our best judgment on the stipulated facts, we conclude that the useful life of the contract rights in issue here was 5 years. If the income-forecast method is used, the partnership will be required to recalculate its depreciation deduction as provided in Bailey v. Commissioner,90 T.C. at 619-621. *551 Investment Tax Credit
In order to claim an investment tax credit with respect to a motion picture film, the taxpayer must have an "ownership interest" in the film and the film must be "new section 38 property" (determined without regard to useful life) which is a "qualified film." Sec. 48(k)(1)(A). For purposes of subsection (k) of section 48, a taxpayer's "ownership interest" in a qualified film is determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film. Sec. 48(k)(1)(C). "Qualified United States production costs" is used in lieu of basis in the property in determining the amount of the taxpayer's "qualified investment" available for the credit. Sec 48(k)(5)(B). See also Tolwinsky v. Commissioner,86 T.C. at 1063-1064. Section 1.48-8(a)(4), Income Tax Regs., defines the "ownership interest" required to claim the entire or partial credit with respect to a qualified *552 motion picture: (4) Ownership interest -- (i) In general. To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to production costs by a taxpayer is the amount that the taxpayer's capital is at risk. * * * * * * (iii) Certain lenders and guarantors considered to have an ownership interest. To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the *553 funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film. * * *
For purposes of section 1.48-8, Income Tax Regs., "a part" of a film "means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in the medium(s) in the geographical area(s)." Sec. 1.48-8(a)(2), Income Tax Regs.
The partnership did not possess an ownership interest in any part of the picture for purposes of the investment credit. As previously discussed, the partnership acquired no depreciable interest in the picture because Fox effectively retained all substantial rights in the picture, including the exclusive right to exploit the picture worldwide. Petitioners do not contend that the partnership was a lender or guarantor by virtue of the transactions with Fox, and we have rejected respondent's contention *554 to that effect. The partnership did not possess an ownership interest sufficient under section 1.48-8(a)(4)(iii), Income Tax Regs., and petitioners are not entitled to an investment tax credit with respect to the picture. Accordingly, we need not discuss respondent's alternative arguments. Additions to Tax and Additional Interest
As set forth in the stipulation, respondent makes claims for additions to tax under sections 6659 and 6661 and for additional interest under section 6621. The burden of proof is on respondent because such claims were not included in the notice of deficiency and, therefore, are new issues. Rules 122(b) and 142(a), Tax Court Rules of Practice and Procedures.
1. Section 6659.
Petitioners claimed on their 1982 return a 2.50 percent distributive share of the partnership's total claimed loss of $ 5,149,349, of which $ 2,250,000 represented the partnership's depreciation deduction. The partnership's depreciation deduction was based on the partnership's reported basis in the picture of $ 15,000,000. Petitioners also reported *555 a "pass through" basis in the picture of $ 225,185 and claimed an investment tax credit of $ 22,519. We have concluded that the partnership's correct basis in the picture for depreciation and investment tax credit purposes is $ 400,000 and zero, respectively.
Section 6659 provides in pertinent part: (a) Addition to Tax. -- If -- (1) an individual, * * * * * * has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. (b) Applicable Percentage Defined. -- For purposes of subsection (a), the applicable percentage shall be * * * The
If the valuation claimed is
applicable
the following percent of the
percentage
correct valuation --
is:
More than 250 percent
30
(c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the * * * adjusted basis of any property, claimed on any return is 150 percent or more *556 of the amount determined to be the correct amount of * * * adjusted basis * * * There are in this case valuation overstatements for purposes of depreciation and investment tax credits because the reported bases exceed the correct bases by at least 150 percent. The result was an underpayment of petitioners' tax attributable to the overstatement of basis on the partnership return depreciation schedule and on the individual return Form 3468. Because the valuation overstatements exceed 250 percent of the correct amount, the applicable percentage is 30 percent. The disallowed investment tax credit and the portion of the underpayment attributable to the partnership's depreciation deduction are subject to section 6659(a). 2. Section 6621.
Section 6621(c) provides for an increase in interest rate in respect of interest payable under section 6601 where there is a "substantial underpayment" (an underpayment of at least $ 1,000) "attributable to one or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into *557 prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). A tax-motivated transaction includes "any valuation overstatement (within the meaning of section 6659(c))." Zirker v. Commissioner, 87 T.C. at 981; Law v. Commissioner,84 T.C. 985, 989 (1985). Based on our conclusion that section 6659 is applicable, section 6621(c) also applies to the same portion of the underpayment. Sec. 6621(c)(3)(A)(i). 3. Section 6661.
Section 6661 generally provides an addition to tax for any underpayment attributable to substantial understatements of tax liability. Any portion of such substantial understatement on which an addition is imposed under section 6659 shall not be taken into account for purposes of determining the section 6661 addition. Section 6661(b)(3). Section 6661 does not apply to the portions of petitioners' underpayment attributable to the disallowed investment tax credit and to the partnership's depreciation deduction, *558 which are subject to section 6659. By agreement, the Court's opinion in Madden v. Commissioner will determine if petitioners have otherwise understated their 1982 tax liability. We will not speculate here about the result in that case or the applicability of section 6661 to any underpayment there determined. For the foregoing reasons, Decision will be entered under Rule 155.
Footnotes
1. All Section references are to the Internal Revenue Code as amended and in effect during the year in issue, except as otherwise noted. ↩